## The Chicago & Alton Railway Company v. William O'Leary, Administrator.

### Gen. No. 4,621.

1. ORDINARY CARE—*when question of exercise of, by plaintiff must be submitted to jury.* Unless the negligence of the plaintiff is proved by such conclusive evidence that there can be no difference of opinion as to its existence upon the mere statement of facts, the jury must pass upon it.

2. ORDINARY CARE—*what not inconsistent with, under circumstances of extreme peril.* Persons in position of great peril are not required to exercise all of the presence of mind and care of a prudent and careful man; the law makes allowances for them and leaves the circumstances of their conduct to the jury.

Action on the case for death caused by alleged wrongful act. Appeal from the Circuit Court of Livingston County; the Hon. THOMAS M. HARRIS, Judge, presiding. Heard in this court at the October term, 1905. Affirmed. Opinion filed April 20, 1906.

C. C. & L. F. STRAWN, for appellant.

J. D. MITCHELL and R. S. MCILDUFF, for appellee.

MR. JUSTICE FARMER delivered the opinion of the court.

Michael O'Leary was struck and run over on the 13th day of October, 1900, at about 8:15 P. M., at a street crossing in the village of Odell, by a locomotive on appellant's tracks drawing a train of freight cars. He received injuries from which he died about an hour later, and his administrator brought this suit to recover damages for his next of kin. The first trial of the case resulted in a verdict for the defendant which the court set aside. The second trial resulted in a verdict for plaintiff upon which judgment was rendered. Upon appeal to this court this judgment was reversed and the cause remanded. C. & A. R. R. Co. v. O'Leary, 102 Ill. App. 665. Another trial resulted in a verdict and judgment for plaintiff for $2,527.76, and defendant prosecutes this appeal.

In appellant's original brief several alleged errors are urged as grounds for reversal of this judgment, but in its

reply brief these are all abandoned except the insufficiency of the evidence to authorize a recovery, and counsel say they desire that "the cause be considered and determined upon its merits upon the facts and circumstances of the accident, and not upon errors in instructions, reversible errors though they may have been."

The village of Odell contains a population of about 1,000 and appellant's double track railroad passes through it in a northeasterly and southwesterly direction. The streets of the village cross the railroad at right angles. For the sake of brevity we will hereafter refer to the railroad as running north and south and the streets as east and west. The depot is on the west side of the railroad tracks. The west track is used by south-bound trains and the one next east by north-bound trains. Next east of the north-bound track is a side track. Between the north-bound and south-bound tracks, opposite the depot is a platform upon which trucks are handled and from which passengers are received and discharged by north-bound trains. Just north of the depot Hamilton street, which is one of the principal thoroughfares of the village, crosses the railroad from east to west. A part of the middle portion of the street is planked for a team crossing, and on the north side of the street the tracks are crossed by a board sidewalk for use of foot passengers. The right of way of appellant east of its tracks and north of Hamilton street from near the north line of the street was occupied by a grain office and elevator. Some of these buildings stood near to the side track. The distance between the side track and north-bound track is about eight feet, and between the side track and south-bound track about twenty feet. On the night of the accident one or more freight cars were standing on the side track north of Hamilton street and extended down to within a few feet of the sidewalk. A few minutes after eight o'clock in the evening a passenger train from the south stopped opposite the depot and platform between the north-bound and south-bound tracks to receive and discharge passengers and baggage. While it was thus engaged a freight train came

from the north, and in passing over Hamilton street struck and injured O'Leary, who was attempting to cross the street on foot, so that he died very soon thereafter.

O'Leary was a laboring man and had lived in Odell many years. A short time before his injury he went into a barber shop on the west side of the railroad, where he found an acquaintance named Cullen. He invited Cullen to go with him to a saloon on the east side of the railroad to get a glass of beer. Cullen at first declined, but upon O'Leary insisting accompanied him. After drinking one glass of beer each, they started back across the railroad on the sidewalk on the north side of Hamilton . street. When they reached the track they observed the passenger train standing south of them opposite the depot. They proceeded on west over the side track and until they reached the passenger track. Cullen testifies that at this time he heard a noise to the north and looking in that direction he saw the freight engine coming, and hallooed to O'Leary that they had better not cross, that it was dangerous, to which O'Leary replied, "If we hurry we will get across." The witness testified he jumped back and hallooed to O'Leary again that there was danger, but he continued on. He thinks O'Leary was looking at the passenger train. He did not see the engine strike deceased, and does not know that he saw the freight. Two ladies had started to cross the tracks just ahead of Cullen and O'Leary, but one of them saw the train approaching from the north, took hold of her companion's arm, warned her of the danger and they turned back east when they were passed by the two men going west. The evidence shows the view of the track north was obstructed from one approaching from the east until after the side track was passed. From the west side of the side track the view was unobstructed for two miles or more. The engineer in charge of the freight train testified he did not see O'Leary, and did not know he had struck any one until he had stopped his train with his engine standing a little south of Hamilton street, where he alighted from his engine, and on the east side of it he found

O'Leary lying with his legs under one of the drive-wheels and his body on the platform, between the two tracks. He testified he asked him if he struck him with his engine and that O'Leary said no, that he then asked him if the passenger engine struck him and he said no. He then asked him how he came there, and O'Leary replied that he fell. The engineer said in talking to him he noticed the odor of liquor on his breath, and asked him if he had been drinking, and he said yes, and upon further inquiry by the engineer if he had been drinking very much he said no, just a little. From these and some other circumstances of a less important character appellant argues that it clearly appears deceased was not in the exercise of due care and caution, but was guilty of such negligence as to preclude a recovery, and it is contended the trial court erred in not directing a verdict. There were various grounds of negligence charged in the numerous counts of the declaration, among them being general negligence in the running and management of the freight train, wilfully and wantonly running down the deceased, failure to comply with the statute requiring a bell to be rung or whistle sounded on approaching the street crossing, running the train at a speed of more than eight miles an hour in violation of the village ordinances, negligence of appellant's servants in charge of the train and block signals, and wantonly and wilfully running the train over the street crossing at a high and dangerous rate of speed, while servants of appellant in charge of the passenger train wrongfully and wilfully blew a large number of loud and sharp whistles as the freight was approaching, thereby frightening the deceased, and two counts charging the wilful, negligent and wanton running of the freight train between the passenger train and station, in violation of rule thirteen of appellant which requires trains approaching a station where double tracks were used and where a passenger train is standing receiving and discharging passengers to be stopped before reaching the passenger train and not start until it moves forward. One of these latter counts charged deceased knew of this rule, while the other one did not.

The evidence shows that the engine of the north-bound passenger train was standing partially at least in Hamilton street, the pilot being near the south side of the planking used for a wagon crossing. Next behind the tender was the baggage car and next, two passenger coaches. These coaches stood opposite the platform between the two tracks which was the usual stopping place for north-bound trains. There is a decided conflict in the testimony as to the rate of speed at which the freight train approached Hamilton street. Nine witnesses testified for plaintiff to its speed ranging all the way from ten up to twenty miles an hour. One witness that north of Vermillion street, which is one block north of Hamilton, it was running from twenty-five to thirty miles an hour. Four members of the crew in charge of the train and one other witness testify it was not running over four or five miles an hour. The engineer and fireman testified the flues leaked water on the fire and that enough steam could not be made to run at a greater rate of speed coming into the village, as it was up grade. The engineer claimed he had the train under complete control as he approached Hamilton street, and he and other members of the crew testified it was brought to a gradual stop without the use of the emergency brakes. The engineer says he did not intend to stop at Odell, unless he was required to, as he wished to make Pontiac ahead of a fast passenger train that was following him; that he knew he should have passed the passenger train, also a local freight before he arrived at Odell, but had not done so; that as he approached the depot at Odell the block signal was against him and he gave the train signals for it and was given the go ahead signal by the operator; that he saw the headlight of a train at the station, but thought it was the local freight, until he was within two car lengths of Hamilton street, when he discovered it was a passenger and applied the service brakes and stopped his train. When his train came to a standstill his engine was south of Hamilton street and opposite the door of the baggage car. The evidence shows there was a considerable number of people about the depot plat-

forms and passengers getting on and off the passenger train.
As the freight train approached Hamilton street the en-
gineer of the passenger train blew the whistle to warn his
train crew and then blew fifteen or twenty short, sharp
blasts for the approaching freight.  By this time the train
was near the street and according to the evidence the
engineer on that train sounded his whistle also.  A large
number of witnesses testified for appellee that the freight
train was stopped very suddenly, that when the brakes
were applied fire rolled from the wheels and that the bump-
ing together of the cars made a great roar and noise, a
number of them describing it as "awful."  The weight of
the proof abundantly sustains the contention that the stop
was not a gradual and usual one, but was sudden and un-
usual.  One witness testified he saw O'Leary when the pilot
hit him and that he was on the sidewalk on the north side
of the street, but did not see him after he was struck.
Another testified he caught a glimpse of a man just as he
rolled off the pilot near the south side of the street.  This
makes it reasonably clear that O'Leary was struck while
attempting to pass over the sidewalk, carried on the pilot
part way across the street, then rolled off, was caught by
the wheels and dragged to the place where he was found
when the train stopped.  We attach no importance to the
conversation the engineer testified to having with him, for
it is apparent from his mangled and shocked condition that
his mind could not have been clear as to what had hap-
pened; besides his statements are not in harmony with the
testimony of eye-witnesses who were in possession of their
faculties.

It is very earnestly argued that as two other parties en-
deavoring to cross appellant's tracks at the same place, one
of them ahead and one with deceased, saw the train ap-
proaching from the north and stopped before going on the
track, and in view of the further fact that after passing
over the side track the view north was unobstructed for a
considerable distance, the necessary conclusion must be that
deceased was guilty of negligence which caused or contrib-

uted to his death. While it was incumbent upon the plaintiff to prove the negligence charged in one or more of the counts of the declaration, that such negligence caused the death of O'Leary and that he was himself in the exercise of due care and caution for his own safety, if there was any evidence fairly tending to prove these things, its sufficiency was required to be submitted to the jury for determination. The weight of the proof shows the train was running at a rate of speed in excess of that allowed by the village ordinances, and in violation of appellant's rule 13 prohibiting a train from running between a passenger train and the depot while the passenger train was standing and engaged in receiving and discharging passengers, and that no bell was rung or whistle sounded in the manner required by statute. It is admitted by the engineer that he had not intended to stop at Odell, but was intending to go on to Pontiac ahead of a fast train following him, which would have been very risky if his engine could not make better time than he said it had been and was making. Rule 13 had been in force many years, and the engineer knew the passenger train was late, that it had not passed him and that he was likely to find it at any station. The evidence shows the whistle was not sounded nor the bell rung in accordance with the requirements of the statute. There probably were some blasts of the whistle blown, but it was not continuous for the space of eighty rods before reaching the Hamilton street crossing, nor was the bell rung continuously from a point eighty rods north of the crossing until it was reached. A large number of witnesses testified that they heard neither whistle nor bell at any time before the train reached Hamilton street. The fireman testified he began ringing the bell just before the train reached Vermillion street, which was three hundred feet north of Hamilton street. The testimony fully warrants the conclusion that appellant's servants were guilty of negligence.

Whether the deceased was guilty of negligence which contributed to his death must be determined from a consideration of all the conditions and circumstances surround-

ing him at the time as shown by the evidence.  This is a question of fact to be submitted to the jury, unless the court can say as a matter of law that the conclusion of negligence necessarily results from the statement of facts. " Unless the negligence of the plaintiff is proved by such conclusive evidence, that there can be no difference of opinion as to its existence upon the mere statement of facts, the jury must pass upon it." L. S. & M. S. Ry. Co. v. Ouska, 151 Ill. 232; C., C., C. & St. L. Ry. Co. v. Keenan, 190 Ill. 217; C. & I. R. R. Co. v. Lane, 130 Ill. 116.

The proof in this record warrants the conclusion that O'Leary never saw the freight train approaching from the north before he went upon the track.  His companion did see it, but not until they were on or very near the track the passenger train was standing on.  It was just at this time the engineer saw the freight was apparently going to pass between his train and the station and rapidly blew so many shrill sharp whistles.  The passenger engine was but a few feet south of O'Leary and he was just in front of it. While he had been drinking a little, according to proof he was sober.  It is neither unreasonable nor unusual that, dark as the night was, situated as O'Leary was, these noises would tend to startle and frighten him.  Cullen testified he heard so many whistles he could not tell where they were.  Says he looked north, saw the freight, that he was excited and told O'Leary they had better not cross, and he, Cullen, jumped back.  He says O'Leary kept looking at the passenger train.  It is evident from all the proof that in his excited and frightened condition O'Leary was trying to get out of the way of the passenger train, and it was this train he referred to when he replied to Cullen they could get across if they hurried.  Such a din and noise, as the evidence shows was made there, and occurring suddenly, as the evidence shows it did, was well calculated to confuse most any ordinary person, and even if he had seen the train from the north, he found himself, as he believed, threatened with danger from both directions.  There is nothing in the proof that would warrant a court in holding as a

matter of law that the deceased was guilty of negligence in approaching appellant's tracks at the time and place and for the purpose he approached them. It was a public street crossing and he had an equal right to its use with appellant. Appellant's servants knew Hamilton street crossing was a much frequented one by inhabitants of the village, and O'Leary had a right to assume they would not run a train down over it at a prohibited rate of speed and without giving the signals required by law. L. S. & M. S. Ry. Co. v. Johnson, 135 Ill. 641. Having suddenly found himself in an unexpected place of peril he could not be expected to act with the deliberate judgment of a man under no apprehension of danger. Persons in position of great peril are not required to exercise all the presence of mind and care of a prudent and careful man; the law makes allowances for them and leaves the circumstances of their conduct to the jury. Galena & C. U. R. R. Co. v. Yarwood, 17 Ill. 509; Dunham Towing & Wrecking Co. v. Dandelin, 143 Ill. 409; Wolff Mfg. Co. v. Wilson, 46 Ill. App. 381; North Chicago St. R. R. Co. v. Louis, 35 Ill. App. 477.

We have endeavored to examine carefully the merits of this case as requested by counsel for appellant and cannot resist the conclusion that the judgment is sustained by the evidence, and it is therefore affirmed.

*Affirmed.*