Jesse W. Mitchell, Appellee, v. Louisville and Nashville Railroad Company, Appellant.

636

CULBERTSON, JR., J., dissenting.

Heard in this court at the October term, 1939. Opinion filed March 7, 1940. Rehearing denied June 18, 1940.

FARMER, KLINGEL & BALTZ, of Belleville, for appellant.

Jos. B. McGLYNN, of East St. Louis, for appellee; JOHN J. HOBAN, of counsel.

MR. PRESIDING JUSTICE STONE delivered the opinion of the court.

Plaintiff, a resident of Covington, Kentucky, while employed as a switchman by defendant in the Decoursey Yards, near Covington, Kentucky, was injured on the 3rd day of July, 1938, by being knocked from the top of a ladder on the side of a freight car that he was then engaged in switching, by the alleged negligence of the defendant; thrown to the ground and injured. He brought suit in the city court of East St. Louis in St. Clair county, under the provision of the Federal Employers' Liability Act, conferring concurrent jurisdiction upon State and Federal Courts and allowing the plaintiff to lay the venue of such action in the district where the defendant shall be doing business at the time of the commencement of the action.

There was a verdict for $32,400 and the defendant appeals from the judgment for this amount. The suit was tried upon an amended complaint, which charged that plaintiff was injured by the alleged negligence of the defendant company, while it was engaged in interstate commerce and the answer of the defendant there-

to, denying that the plaintiff and defendant were engaged in interstate commerce at the time of plaintiff's injury.

The accident occurred around 2:50 on the morning of July 3, 1938 in the Decoursey Yards of the defendant, near Covington, Kentucky. These yards were known as classification yards, where freight trains were broken up and classified preparatory to being made up into other trains. The general direction of the yards is from north to south. The yards are made up of a number of yards designated as yard "A" "B" "D" or 26 and others. Between yards "A" and "B" are what are called the main hump track and lower hump track, which are in the main parallel, but of inequal distances apart. In yard "B," starting from the west side, the switch tracks are numbered from 1 to 12; number 12 being an extension of the main hump track and being also known as the lead track. These hump tracks are gravity tracks to which cars are hauled from yard "A" by an engine; the cars are run into various tracks in yard "B" by force of gravity, south of the crest of the hump.

The crews working in this yard are called hump crews, and consist of an engineer, fireman, switch tenders, car riders, and an employee who follows the engine and directs the movements of cars being placed on the various tracks. The movement of the cut of cars involved here was directed by the plaintiff, who was the "follower of the engine" of this crew. It was his duty to signal the engineer and the duty of the engineer to obey such signals. Early on the morning in question one car had been picked up by the engine on track number one, and seven or eight cars on tracks six or seven. There seems to be no controversy that as they came to the lower southbound hump, plaintiff gave a stop signal and the engineer stopped. This signal was given by lantern. The plaintiff then gave a come-ahead signal, which seems to have been for the purpose of taking up

the slack that had run out in the train; a stop signal was then given by the plaintiff in order to effect the cut of the seven or eight cars, taken from tracks six or seven. The plaintiff then testified that he gave the engineer a back-up signal, and that the engineer instead, moved the engine forward, causing the cars to run away. Caldwell, the engineer, and Webster and Dorning, other members of the train crew, testified that the signal given by the plaintiff was a go-ahead signal. Plaintiff then ran after the cut of cars alleged to be runaways, boarded one of them and started climbing the ladder on the side of the car and had about reached the top of the car, when the cut of cars on which he was then riding, collided with another cut of cars standing stationary on the south end of the track. Plaintiff was thrown over against the crossover rail, and sustained a compression fracture of the first lumbar vertebra.

Defendant contends that there is no liability on its part, because of the doctrine of assumed risk, and contributory negligence on the part of the plaintiff, arguing that he was in a place of safety and voluntarily and unnecessarily went to a place of peril. Plaintiff earnestly contends that the doctrine of imminent peril applies; that he was trying to protect fellow employees alleged to have been down on 26 and the company's property from injury, and counsel say that if that theory does not apply, then plaintiff has no cause of action. The question of contributory negligence on the part of the plaintiff is a question of fact for the jury. *Devine v. Pfaelzer,* 277 Ill. 255, aff'g 195 Ill. App. 221; *Leiter v. Kinnare,* 68 Ill. App. 558; *Pienta v. Chicago City R. Co.,* 284 Ill. 246; *Illinois Cent. R. Co. v. Anderson,* 184 Ill. 294.

The question of assumption of risk by the employee is also a question of fact for the jury. *Chicago Screw Co. v. Weiss,* 203 Ill. 536; *Shoukair v. Sargent Co.,* 235 Ill. 509; *Chicago L. S. & E. R. Co. v. Cukravony,* 132 Ill. App. 367; *Davenport v. Ziegler Dist. Collieries Co.,*

179 Ill. App. 552. So, also, is the question of whether plaintiff's conduct, in time of alleged imminent peril, constituted contributory negligence. *Galena & C. U. R. Co. v. Yarwood,* 17 Ill. 509; *Chicago & A. R. Co. v. O'Leary,* 126 Ill. App. 311; *Chicago Terminal Transfer R. Co. v. Kotoski,* 101 Ill. App. 300, aff'd 199 Ill. 383.

Other questions are raised such as the correctness of instructions, illegality of the panel of jurors drawn, improper conduct of counsel, and the admissibility of certain expert, medical testimony. These we do not deem it necessary to discuss, or to pass upon, as the judgment must be reversed for other reasons.

The burden was upon the plaintiff in this action to establish the fact that the defendant, at the very time when its employee through its alleged negligence received the injuries complained of, was engaged in interstate commerce, the presumption being, in the absence of such proof, that the employer while in the use and operation of its railway within the State of Kentucky, was engaged in intrastate commerce. *Terry v. So. Pacific Co.,* 34 Cal. App. 330, 169 Pac. 86; *Bradbury v. Chicago R. I. & P. R. Co.,* 149 Iowa 51, 128 N. W. 1; *Osborne v. Gray,* 241 U. S. 16, 36 Sup. Ct. 486, 60 L. Ed. 865. In the production of such required proof it was necessary for the plaintiff in this case to show that one or more of the units in the train of cars, which defendant was engaged in moving along its tracks at the time of plaintiff's injuries had been definitely accepted and designated by said defendant for interstate uses, and was moving at such time along the line of its or their destiny. *Johnson v. Southern Pac. Co.,* 199 Cal. 126, 248 Pac. 501.

Plaintiff testified that he had instructions from the foreman to go down No. 1 track and get a car of perishables, to which, objection was made by the defendant. What plaintiff did and that he did it by the direction of his foreman was evidentiary, but that some one said at

the time that one of the cars was a car of perishables was no evidence of what it in truth was. If the statement had been made by a bystander, it clearly would not have been evidentiary. The circumstance that it was made by the foreman, who directed the work to be done did not make it evidentiary. *Mirkowicz v. Reading Co.*, 84 F. (2d) 537; *Central R. Co. of N. J. v. Sharkey*, 259 Fed. 144. The objection to this testimony should have been sustained. Plaintiff was then asked how he knew it was a car of perishables and in answer thereto testified that "it had a sticker on it, a yellow card, a card that we switch the cars by and it had spelled on it 'perishable' in red letters—then it has black letters on there too—the rest of the car is made up with pencil—it was marked 'Memphis Line, from Cincinnati, Ohio' is what was on the card." To which testimony the defendant objected, but which was admitted by the court, apparently upon the theory that notice had been given the defendant to produce certain records; and upon their failure to do so, this alleged secondary proof was admissible. Based upon this card, plaintiff was permitted to testify that being carded, "Memphis Line" meant a car that goes to Memphis, or beyond there, from Cincinnati, Ohio; that its origin was Cincinnati, Ohio, and its destination Memphis, Tennessee and beyond, which was an attempt to prove that this car, was engaged in interstate commerce, at the time of the injury to the plaintiff. Upon no theory was this evidence competent. The giving of notice to produce records and failure to produce them does not justify the admission of incompetent evidence.

Even if this particular car did contain perishables, that raised no presumption as to its being used in interstate commerce. There is no evidence that it was loaded except the testimony of plaintiff to the effect that he looked on both sides of the car and saw that it was sealed, and that he did nothing more than look at

the carding on the car. There was no effort to show the authenticity of said card. There was no evidence to show at what time, at what place or by whose authority said card was placed upon said car, or that said car was being moved at that time by virtue of the instructions upon said card.

There is no evidence that the car was accepted for interstate shipment because of this sticker on the car, with its pencil markings, or that thereby interstate commerce had in any sense begun. Such an inscription by an unknown person, in our opinion falls short of an assignment to interstate shipment sufficient to bring the case within the Federal Employers' Liability Act. It was not shown when the marks were placed on the car, or whether they had any connection with any present shipment or if it pertained to some previous shipment. This evidence was incompetent and objection by defendant should have been sustained. *McCoy v. Southern Pac. Co.,* 29 Cal. App. (2d) 16, 83 P. (2d) 970; *Wise v. Lehigh Valley R. Co.,* 43 F. (2d) 692; *Johnson v. Southern Pacific Co.,* 199 Cal. 126, 248 Pac. 501.

In the *McCoy* case, 29 Cal. App. (2d) 16, 83 Pac. (2d) 970, which was brought under the Federal Employers' Liability Act for injuries sustained when the plaintiff, a switchman fell from a box car, evidence that freight cars, which were being switched at the time of his injuries bore cards, which indicated that destinations of the cars were outside the State, was inadmissible on the issue as to whether plaintiff and defendant were engaged in interstate commerce at the time of plaintiff's injuries, where there was no evidence showing the authenticity of the cards.

In the case of *McCoy v. Southern Pac. Co., supra,* the court said with reference to cards on freight cars, ''Plaintiff testified that on car 88589, the bad order car, he saw a plain white card marked in pencil, 'May 21, Portland to Newark, for salt loading'; that on another

car which the engine had hold of at the time, there was a plain white card marked 'Yuma, Arizona'; that on another such car, there was a card marked 'Kansas City, Mo.'; and that on another such car there was a plain white or gray card marked 'D. S. K. for Ogden.' There was not a particle of evidence showing the authenticity of said cards. There was no evidence to show when, where or by whom said cards were placed upon said cars or to show that said cars were moving under said cards at the time in question." The evidence there submitted was held incompetent.

It was testified to, that the car designated by plaintiff and his counsel as perishables, was picked up on tracks one or two and then seven or eight cars were picked up on tracks eight or nine. These latter were designated as "west enders." Plaintiff was asked whether or not in the language and parlance of the employees of the railroad company, cars so designated had any particular significance. His answer was, "that cars carded as 'west enders' are cars going to connecting lines, maybe the Big Four, the Pennsylvania, the C. and O., or any connecting line—cars from Cincinnati are called 'west enders' and cars intended for Cincinnati." There is no evidence that any of this string of cars were so carded.

The witness Caldwell, the engineer, testified that he did not know what these seven or eight cars were, that he did not know if they were west enders. The witness Webster was asked if west enders were not cars destined for Cincinnati, Ohio, and his answer was, that part of them go in that direction, that they might go to Covington, Newport or any points north or east. There is no dispute, as to the fact that no through freight or passenger tracks pass through the yard where the plaintiff was engaged in switching at the time of his injury. This was designated as a classification yard, described variously as a yard where cars were classified as to their character, as to being coal cars, high cars,

hoppers, gondolas, or box cars, and as a yard where trains were broken up, and classified, and new trains made up, going to points outside the yard.

Plaintiff testified that he would have eventually taken the car described as perishables back to number 12 track. With reference to the cars designated as west enders the following questions were propounded and the following answers given by the plaintiff:

Q: You knew cars were set in those tracks there until they were wanted?

A: At times.

Q: To get them out of the way there, isn't that right?

A: At times.

Q: Those were empty cars you were setting in there?

A: Yes, sir, west enders.

Q: They were going to be left there, weren't they?

A: Yes. Page 144 of record.

There is no evidence as to what train either cut of cars would have been attached to, or what the ultimate destination would be. Both plaintiff and his counsel during the course of the trial continued to designate the one car as perishable and the others as west enders, but this record does not show any definite destination as to any part of the train upon which plaintiff was working at the time of his injury, certainly it does not show any destination outside of the State of Kentucky.

In the case of *Devine v. C. R. I. & P. Ry. Co.*, 266 Ill. 248, cited by counsel, the Supreme Court of Illinois indicated that slight evidence, uncontradicted, that the train upon which plaintiff was working at the time of the injury or death complained of, was engaged in interstate commerce, would be sufficient, upon which to base a finding that the case came within the Federal Employers' Liability Act. There the conductor of the train, in answer to the question, "Some cars going out of the State and some going to points in the State?"

answered in the affirmative. In the instant case there is not even this amount of evidence on that point, that is competent and admissible. The record fails to show any competent evidence, which with all of its inferences, would reasonably tend to show that at the time plaintiff was injured he was engaged in interstate commerce or transportation.

At the conclusion of plaintiff's case and again at the close of all of the evidence, defendant moved the court to instruct the jury to find the defendant not guilty. These motions were denied. This was error which calls for reversal of the judgment. For the reasons stated the judgment is reversed.

*Judgment reversed.*

CULBERTSON, JR., J., dissenting.